**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leonard Ray BLANTON (81–5644), Clyde Edward Hood, Jr. (81–5645), James M. Allen (81–5643), Defendants-Appellants.**

**Nos. 81–5643 to 81–5645.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 7, 1982.

Decided Feb. 11, 1983.

Rehearing En Banc Granted
April 7, 1983.

Joe B. Brown, U.S. Atty., Aleta Arthur, John Philip Williams, Asst. U.S. Attys., Nashville, Tenn., for plaintiff-appellee.

Tyree B. Harris, Dodson, Harris, Robinson & Aden, Nashville, Tenn., for defendant-appellant Allen.

John S. McLellan, Kingsport, Tenn., John S. McLellan, III,. Kingsport, Tenn., Neal P. Rutledge, Washington, D.C., for defendant-appellant Blanton.

William R. Willis, Jr., Robert L. Delaney, Alfred Knight, Nashville, Tenn., for defendant-appellant Hood.

Before ENGEL, and KEITH, Circuit Judges and GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Defendants appeal their convictions for acts relating to the issuance of retail liquor licenses in Tennessee during the administration of the former governor of Tennessee, defendant Leonard Ray Blanton.

## I. Facts

The three defendants are Blanton, who served as governor of Tennessee from January, 1975 to January, 1979, James M. Allen, who was a special consultant to the governor for the first six months of the Blanton administration and had served as Blanton's campaign manager, and Clyde Edward Hood, who was a special assistant to the governor from January, 1975 to November, 1977. Defendants were charged on October 29, 1980, in a twelve-count indictment with eight counts of mail fraud, (18 U.S.C. §§ 2, 1341 (1976)), one count of violating the Hobbs Act (18 U.S.C. §§ 2, 1951 (1976)), and one count of conspiracy (18 U.S.C. § 371 (1976)). Blanton alone was charged with two counts of tax evasion and filing a false tax return. (26 U.S.C. §§ 7201, 7206(1) (1976)). On March 12, 1981, a superseding indictment was issued adding one mail fraud count. The tax counts against Blanton were severed. The essence of the charges was that defendants used their positions to see that friends of Blanton would receive retail liquor licenses from the Tennessee Alcoholic Beverage Commission (ABC) and that one person paid Blanton for receipt of his license.

The most important evidence against defendants was the videotaped deposition of Jack Ham. Ham was an immunized witness who was the recipient of a liquor license during Blanton's tenure and who allegedly agreed to give Blanton a cut of the profits in violation of state law. Ham had contributed $1,000 to the Blanton campaign.

Blanton's role in the scheme allegedly was that he directed that liquor licenses be awarded to political friends or persons like Ham who offered a cut of the profits. He allegedly accomplished this by appointing two of the three commissioners of the ABC, including the chairman, S.J. King, and the commission was therefore able to appoint Blanton allies as director and assistant director of the ABC. Blanton allegedly agreed to an illegal twenty percent cut of the profits of Ham's liquor store, with the payment coming in the form of Ham's purchase of allegedly worthless oil stock from Blanton for $23,000.[1] (This method of payment resulted in tax savings to Ham.) Blanton also allegedly approved a transfer of Ham's liquor license to a more lucrative location.

Allen was alleged to have been in charge of determining the awarding of liquor li-

---

* Honorable Floyd R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. A total of $38,000 was allegedly paid for the oil stock. In addition to the $23,000 for Blanton's cut of the liquor store profits, Ham and his nephew, Bert Ham, paid another $15,000 as a finder's fee for Blanton's help in getting a loan on a housing project they were building.

censes even though he had no position at the ABC. He allegedly helped set up an illegal ownership of a liquor store involving the ABC chairman and he attempted to acquire a concealed interest in a liquor store under the guise of a lucrative consulting contract (only one payment was made under the contract). He allegedly was responsible for hiring a new ABC assistant director to help control the ABC even though Allen was not even a state employee at the time, and he instructed the assistant director to recommend the transfer of Ham's license to a better location and recommend against the transfer of other persons' licenses to that area.

Hood allegedly planned to acquire an interest in two liquor stores in contravention of various state laws and he received a share of the profits of some of the newly licensed liquor stores. He allegedly told the director of the ABC who Blanton's friends were so that the director would recommend to the ABC that those persons receive licenses. He allegedly helped accomplish the transfer of Ham's license by talking to ABC chairman King and by suggesting a particular person as the assistant director who would persuade the other Blanton appointee on the commission. Finally, he allegedly suggested that Ham pay Blanton's share of the profits by buying the worthless oil stock (although he later advised against the purchase).

The scheme violated Tennessee's laws against an ABC commissioner having an interest in a liquor store,[2] public officials having an interest in a liquor store,[3] undisclosed interests in liquor stores,[4] and bribing of public officials.[5] The federal charge was that the acts (1) constituted a conspiracy to defraud the United States by use of the mails in furtherance of defendants' scheme to violate Tennessee law (18 U.S.C. § 371), (2) when coupled with mailings, constituted mail fraud by defrauding the citizens of Tennessee of the honest services of their government officials (18 U.S.C. §§ 2, 1341), and (3) violated the Hobbs Act (interference with commerce by threats or violence) (18 U.S.C. §§ 2, 1951).

The testimony of the chief prosecution witness, Jack Ham, was videotaped pursuant to Fed.R.Crim.P. 15(a) because of Ham's poor health. The videotape was edited and played for the jury at the trial. The government obtained Ham's testimony offering him immunity from federal prosecution and civil tax liability, and the state agreed not to prosecute Ham. The ABC agreed that it would not revoke Ham's lu-

2. Tenn.Code Ann. § 57–1–108(a) (1980) provides: "[N]o person shall be employed in any capacity by the commission, if such person shall have any interest ... in any ... retail dealer licensed as such in the state of Tennessee."

3. Tenn.Code Ann. § 57–3–210(b)(1) (1980) provides:

No wholesaler's or retailer's license shall be issued to a person who is a holder of a public office .... It shall be unlawful for any such person to have any interest in such wholesale or retail business, directly or indirectly, either proprietary or by means of any loan, mortgage, or lien, or to participate in the profits of any such business[.]

4. Tenn.Code Ann. § 57–3–210(f) (1980) provides: "It shall be unlawful for any person to have ownership in, or participate, either directly or indirectly, in the profits of any wholesale or retail business licensed under this chapter, unless his interest in said business and the nature, extent and character thereof shall appear on the application ...."

5. Tenn.Code Ann. § 39–801 (1975) provides:

Any person who corruptly offers, promises, or gives to any executive ... officer ... any gift, gratuity, or thing of value, with intent to influence his act, vote, opinion, decision, or judgment, on any matter, cause, or proceeding which may be then pending, or which may be by law brought before him in his official capacity, shall, on conviction, be imprisoned in the penitentiary ....

Tenn.Code Ann. § 39–802 (1975) provides:

Any executive ... officer who corruptly accepts, or agrees to accept, any gift or gratuity, or thing of value ... under an agreement or with an understanding that his vote, opinion, or judgment is to be given in any particular manner, or upon any particular side of any question or proceeding which is, or may by law be brought, before him in his official capacity, or that, in such capacity, he is to make any particular appointment, shall, on conviction, be punished by imprisonment in the penitentiary ....

crative liquor license on the basis of truthful statements he made in judicial proceedings.

The trial was preceded by massive publicity about the case in Nashville, Tennessee, and throughout the state, as one would expect in the trial of a former governor. The record contains over 240 articles from Nashville newspapers adverse to defendants. There are approximately 160 articles which appeared in the six months preceding the trial about the instant prosecution, the prosecution of Blanton's brother, and the prosecution of former Blanton aides.[6] There are more than seventy-five other articles which appeared while Blanton was governor concerning his administration.[7] There are another twenty-two articles on the deposition of Jack Ham, the last of which appeared four months before the beginning of the trial.[8] A large part of the original indictment was published verbatim in the Nashville newspapers. There was also an offer of proof concerning the testimony of news directors of three Nashville television stations about the pretrial publicity. There can be no doubt that there was an extraordinary amount of pretrial publicity concerning this case and other cases involving officials of the Blanton administration and some of Blanton's relatives.

Jury selection began on April 20, 1981. Testimony in the case began on April 22, 1981, and was concluded on May 29, 1981. Closing arguments and jury instructions were completed on June 2, 1981. The court dismissed three mail fraud counts and the Hobbs Act count as to Allen. The jury deliberated until June 9, 1981, and found Blanton guilty on all eleven counts. It found Allen guilty on all the counts the court had not dismissed (six mail fraud counts and one conspiracy count). It found Hood guilty on six mail fraud counts and the conspiracy count, but it found him not guilty on the other three mail fraud counts and the Hobbs Act count. Blanton was sentenced to three years and fined $11,000. Allen was sentenced to two years and fined $14,000. Hood was sentenced to eighteen months and fined $14,000.

## II. Adequacy of Voir Dire

The most difficult issue concerns the adequacy of the voir dire on the subject of pretrial publicity.

### A. Conduct of the Voir Dire.

The trial court conducted the voir dire *en masse*. It seated a group of veniremen in the jury box and directed questions at that group, but instructed the rest of the veniremen in the courtroom to listen to and pay

---

**6.** Most of the very negative publicity came shortly after the indictment: "Blanton Faces 12 Counts," Oct. 30, 1980; "Enlist Blanton's Aid in Obtaining Licenses for Future Profits," Oct. 30, 1980; "Allen's Influence Had Wide Impact," Oct. 30, 1980; "Hood's Success, Woes Laid To Misdirected Talent," Oct. 30, 1980; "Blanton-Era Investigations Span 5 years," Oct. 30, 1980; "Blanton Faces Two Federal Court Trials," Nov. 21, 1980. Not all of the articles were negative: "Blanton's Defense Said Good," Nov. 6, 1980; "Friends Eye Legal Fund for Blanton," Nov. 1, 1980. Two months before trial there were articles on the criminal activities of Blanton aides: "Former ABC Head Enters Guilty Plea," Feb. 23, 1981; "Ex-Blanton Aide Enters Guilty Plea," Feb. 25, 1981; "ABC Probing Blanton Associate's License After Kickback Admission," Feb. 26, 1981. The month before the trial began the superseding indictment was issued, prompting more publicity: "Blanton, 2 Aides Indicted Again," Mar. 12, 1981. As late as four days before trial articles linked Blanton to improper pardons of state inmates: "Tapes Link Blanton to 30 Commuta-

tions," Apr. 16, 1981; "Taylor on Tape Links Ray Blanton To Clemency Deals," Apr. 15, 1981. Blanton's brother Gene was also in the news shortly before trial because of alleged improprieties: "Gene Blanton To Be Accused of Not Telling $72,000 Income," Mar. 24, 1981; "Gene Blanton Bought Autos With Business Funds, Says Frensley," Apr. 16, 1981. Most of the other articles dealt with procedural aspects of pretrial proceedings.

**7.** Most of these articles dealt with patronage in the Blanton administration and the pardon of prisoners, including the pardon or commuting of sentences of 52 prisoners, 23 of them murderers.

**8.** Some of the articles were entitled: "Ham Details Meetings With Blanton," Dec. 6, 1980; "Ham States Hood was 'Silent Partner,'" Dec. 7, 1980; "Ham Threatens TV Cameramen Outside Courthouse," Dec. 10, 1980; "Ham Admits Riches, Refutes Testimony On Pay to Blanton," Dec. 18, 1980.

attention to the questions as the questions would apply equally to all those selected. During the course of the voir dire the trial court pointed out that the case had been the subject of considerable media attention. It commented that it was sure that all the veniremen had heard about the case, and that some of them may have formed a tentative opinion concerning the probable guilt or innocence of the defendants: The court then said to the veniremen:

> [T]he test is, will you be able to put from your minds whatever you may have seen and heard, and any opinion which you may have tentatively reached, and then to decide this case solely on the facts as you determine them to be, on the sole basis of the evidence which will be adduced in this trial after application of the appropriate law?

One juror was excused because she indicated she could not be impartial. As new veniremen entered the jury box to replace the ones who were excused for whatever reason, the trial court would ask them essentially the same question on pretrial publicity. It usually said it wanted to "particularly emphasize" the point. Out of ninety-two veniremen examined, a total of thirteen were excused because they indicated they had an opinion or prejudice they could not put aside. Of these thirteen, four linked their prejudice to pretrial publicity. Seven of these thirteen were excused when they said they had an opinion, without the court inquiring into the nature or strength of the opinion or whether it could be put aside. Twenty-nine other veniremen were excused for cause for other reasons and the parties excused twenty-eight others with their peremptory challenges.

Defendants contend that the voir dire was inadequate to detect prejudice from the pretrial publicity and therefore violated their rights to due process and an impartial jury as guaranteed by the fifth and sixth amendments. *See Ristaino v. Ross,* 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 1021 n. 6, 47 L.Ed.2d 258 (1976). They also argue that the voir dire was inadequate to allow the intelligent use of their peremptory challenges to remove persons suspected of bias, and therefore their right to peremptory challenges under Fed.R.Crim.P. 24(b) was impaired.

## B. Scope of Review.

■ We must first determine the proper scope of review. We have held "the court's determination about the questions to be put to the jury will not be disturbed without a clear showing of abuse of discretion." *United States v. Blount,* 479 F.2d 650, 651 (6th Cir.1973). *See also United States v. Anderson,* 562 F.2d 394, 396 (6th Cir.1977). ("Traditionally, a wide latitude of discretion is accorded the trial court in the selection of jurors.") The trial court is accorded this discretion because demeanor plays an important part in the determination of impartiality, and the adequacy of the voir dire is not easily subject to appellate review. *Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). A trial court's assessment of the force of a venireman's opinion or its finding of impartiality should be set aside only where the error is manifest. *Irvin v. Dowd,* 366 U.S. 717, 723–24, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *Haney v. Rose,* 642 F.2d 1055, 1060 (6th Cir.), *cert. denied,* 452 U.S. 908, 101 S.Ct. 3036, 69 L.Ed.2d 409 (1981).

■ On the other hand, the federal rules limit that discretion by the "essential demands of fairness." *United States v. Johnson,* 584 F.2d 148, 155 (6th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1240, 59 L.Ed.2d 469 (1979); *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931). Furthermore, in the case of a federal defendant, the court can presume prejudice in some instances, in contradistinction to a state habeas petitioner who must demonstrate prejudice. *Goins v. McKeen,* 605 F.2d 947, 951, 951 nn. 7 & 8 (6th Cir.1979); *see Marshall v. United States,* 360 U.S. 310, 312–13, 79 S.Ct. 1171, 1172–73, 3 L.Ed.2d 1250 (1959) (per curiam). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99

L.Ed. 942 (1955). When appropriate, as in highly publicized cases, it is "the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors." *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642. As noted in *Johnson:*

> [T]he 'essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel.' A trial court commits reversible error if, by unduly restricting voir dire, it substantially impairs the peremptory challenge right. Where veniremen have been exposed to prejudicial publicity, the nature and degree of that exposure is certainly a matter of legitimate concern to a defense attorney in deciding on peremptory challenges.

584 F.2d at 155 (citations omitted).

C. Removal for Cause.

■ The first part of defendants' argument is that the voir dire was inadequate to determine which veniremen should have been excused for cause. The trial court undoubtedly applied the right test: Whether the veniremen could lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642; *Johnson,* 584 F.2d at 154. The dispute in this case is whether the procedure was adequate to determine if the veniremen could lay aside any opinions they had formed about the case. In other words, to what extent could the court rely on the veniremen's assurances of impartiality. Cases from the Supreme Court and federal circuit courts given different indications as to the answer to that question.

This court implied in *Johnson* that a court can accept a juror's assurances of impartiality when deciding whether to excuse a venireman for cause. In *Johnson,* the trial court had asked the veniremen whether they had heard or read about the case. Most were questioned individually and were asked when and where they heard about the case. The veniremen assured the court that their prior knowledge would not affect their ability to render an impartial verdict.

After noting this information, the Sixth Circuit said that the veniremen could not have been challenged for cause because it was sufficient that the veniremen could lay aside preconceptions. 584 F.2d at 155, 155 n. 16. On the other hand, we have cited the Supreme Court's pronouncement that "the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights." *United States v. Giacalone,* 588 F.2d 1158, 1163 (6th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979), *quoting Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). In *Giacalone* the court found the voir dire adequate because the voir dire did not indicate a hostility on the part of the jurors toward the defendant. *Id.* In *Goins* the court held that the jurors' assurances of impartiality were insufficient in the circumstances presented. 605 F.2d at 953 (6th Cir.). However, *Goins* can be distinguished on the basis that it dealt with publicity *during* a trial, which creates a greater threat of prejudice. *Id.* at 952; *see Sheppard v. Maxwell,* 384 U.S. 333, 354–55, 86 S.Ct. 1507, 1517–18, 16 L.Ed.2d 600 (1966) (trial court's failure to take precautions against influence of pretrial publicity alone not a denial of due process except when considered in setting of trial publicity).

We cannot consider *Johnson* dispositive of the instant case because the court did not state that the assurances of the veniremen that they would be impartial was alone sufficient. In *Johnson,* unlike the instant case, there was individual questioning and there were inquiries into when and where the veniremen were exposed to the publicity. Therefore we will examine the cases from the Supreme Court and other circuits.

The underlying concern with veniremen making their own assessment of their impartiality was expressed by Chief Justice Marshall when he faced the problem of pretrial publicity as the presiding judge at the trial of Aaron Burr in 1807. Chief Justice Marshall noted that a person will be excused for cause because of his relationship to the parties or because of personal prejudice, even if he promises to make his

decision based solely on the evidence. The law will not trust such a person. *United States v. Burr,* 25 F.Cas. 49, 50 (No. 14,-692g) (CC.Va.1807). Chief Justice Marshall queried: "Is there less reason to suspect him who has prejudged the case, and has deliberately formed and delivered an opinion upon it? . . . He will listen with more favor to that testimony which confirms, than to that which would change his opinion." *Id.*

The problem of veniremen assessing their own impartiality is most acute when the circumstances command a presumption of partiality on the part of the venire. The Supreme Court has acknowledged that this presumption can arise when the publicity is highly sensational or inflammatory, as opposed to factual and straightforward. *Murphy v. Florida,* 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975); *United States v. McNally,* 485 F.2d 398, 403 (8th Cir.1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). *Murphy* also said that the effect of prejudicial publicity is indicated by the number of veniremen who have an opinion as to the defendant's guilt. The court felt that twenty persons with opinions out of seventy-eight veniremen showed that the community was not poisoned with sentiment against the defendant. *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037.

What most courts consider the most important element in determining whether a presumption of prejudice should arise is the strength of the venireman's opinion which he is asked to set aside. Chief Justice Marshall stated:

[L]ight impressions which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him.

. . . *The question must always depend on the strength and nature of the opinion which has been formed.*

25 F.Cas. at 51 (emphasis added).

In the leading pretrial publicity case the Supreme Court said there can be a presumption of partiality in some cases: "[T]he test is 'whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . . .'" *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642, *quoting Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878).

Courts differ on the extent to which a trial court can rely on a juror's assessment of his impartiality. As stated above, we implied in *Johnson* that a juror can assess his own impartiality. But *Giacalone* cited *Murphy,* where the Supreme Court stated in dicta: "[T]he juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" 421 U.S. at 800, 95 S.Ct. at 2036, *quoting Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642. And in *Irvin* the Court said:

No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.

366 U.S. at 728, 81 S.Ct. at 1645. On the other hand, the Supreme Court has said that the representation of a federal employee juror that he will be impartial in a federal case must be credited. *Dennis v. United States,* 339 U.S. 162, 170–71, 70 S.Ct. 519, 522–523, 94 L.Ed. 734 (1950).

Most of the other circuits disapprove of relying on jurors' assurances of impartiality, although the strength of that disapproval varies. In three circuits, reliance on juror's assurances was disapproved under facts very similar to the instant case. The Fifth

Circuit observed: "The juror is poorly placed to make a determination as to his own impartiality. Instead the trial court should make this determination." *United States v. Davis,* 583 F.2d 190, 197 (5th Cir. 1978). The court in *Davis* said that because publicity raised a significant possibility of prejudice, "[t]he court should have determined what in particular each juror had heard or read and how it affected his attitudes toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed." *Id.* at 196. The court said that separate examination of jurors is preferable, but not necessarily required. *Id.* at 196–97. Finally, the court recommended a procedure for trial courts to follow:

> An acceptable procedure is described in *U.S. v. Hyde,* 448 F.2d 815 (CA5, 1971), cert. denied, 404 U.S. 1058 [92 S.Ct. 736, 30 L.Ed.2d 745], ... which dealt with publicity during the course of trial. Even though we held that the publicity was not prejudicial, we were critical of the trial court's asking the jury as a whole if anyone was exposed to publicity that would prevent him from impartially deciding the case. We said:

> > [T]his Circuit has determined that it is for the court, not the jurors themselves, to determine whether their impartiality has been destroyed by any prejudicial publicity they have been exposed to. Therefore, when there has been publicity that would possibly prejudice the defendants case if it reached the jurors, the court should first ask the jurors what information they have received. Then it should ask about the prejudicial effect and it should make an independent determination whether the juror's impartiality was destroyed.

*Id.* at 197. *See also United States v. Hawkins,* 658 F.2d 279, 282–85 (5th Cir.1981). The Second and Ninth Circuits came to similar conclusions regarding a juror's ability to assess his own partiality. *United States ex rel. Bloeth v. Denno,* 313 F.2d 364, 371–73 (2nd Cir. in banc), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963) (jurors' assurances that they could render an impartial verdict despite opinions formed by pre-trial publicity insufficient to show impartiality; change of venue constitutionally required); *Silverthorne v. United States,* 400 F.2d 627, 637–40 (9th Cir.1968) (relies on *Bloeth, supra;* when every juror had some knowledge of case and almost thirty percent had opinions as to defendant's guilt, jurors' assurances of impartiality insufficient; jurors should have been questioned individually).

The Seventh Circuit has also found jurors' assurances inadequate, but in the case in which it did so the trial court did not emphasize the importance of putting aside the publicity before asking a general question on impartiality, as did the trial court in the instant case. *United States v. Dellinger,* 472 F.2d 340, 367–70 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).

Two circuits have stated in strong language, but in dicta, that a juror's assurances are insufficient. In a case where the defendant waived an objection to the composition of the jury, the First Circuit stated: "[A] single question posed to the panel en bloc, with an absence of response, achieves little or nothing by way of identifying, weighing, or removing any prejudice from prior publicity." *Patriarca v. United States,* 402 F.2d 314, 318 (1st Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). The court added that the jurors should have been questioned individually to determine the kind and degree of the exposure to the case, the effect of the exposure, and the extent to which the state of mind was immutable or subject to change from evidence. *Id.*

The District of Columbia Circuit has acknowledged in dicta that under some circumstances relying on jurors' assurances of impartiality is insufficient, but the court has not yet found a case where the district court procedures were inadequate. *United States v. Caldwell,* 543 F.2d 1333, 1345–46 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (no objection by defendants to district court procedure; individual questioning of jurors who

had heard about the case); *United States v. Liddy,* 509 F.2d 428, 436–37 (D.C.Cir.1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975) (individual questioning of veniremen who indicated they might have formed an opinion on the case); *United States v. Bryant,* 471 F.2d 1040, 1044 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973) (individual questioning of veniremen who responded affirmatively to general questions).

Two other circuits have cited *Murphy* for the proposition that jurors' assurances of impartiality are not dispositive, but in both of those cases the procedures were found to be adequate. *United States v. Provenzano,* 620 F.2d 985, 995 (3rd Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980) (publicity not prejudicial); *Brinlee v. Crisp,* 608 F.2d 839, 845–46 (10th Cir.1979), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980) (individual questions on pretrial publicity; minimal publicity; relatively few veniremen had opinions).

This survey of the cases from nearly every circuit suggests less deference to a juror's assessment of his impartiality than the Sixth Circuit implied was appropriate in *Johnson,* 584 F.2d 148. It appears that the Second, Fifth, Ninth and Eleventh [9] Circuits would reverse in a case like the one at bar. Dicta from the First and District of Columbia Circuits indicate they would reverse. The Third, Seventh, and Tenth Circuits expressed suspicion of jurors' assurances of impartiality, but the facts in the cases from those circuits differ too much from the instant case to determine how those courts would ultimately rule. No court has approved of questioning as limited as the questioning in this case where there was substantial pretrial publicity. The questioning here can be considered limited only as it relates to the effect of the pervasive publicity, and the extent and depth of the individual talesmen's exposure to the massive publicity; otherwise the voir dire was admirably conducted by trial court.

In another case from this circuit, the court discussed a juror's assessment of his impartiality in the context of his ability to accept the proposition of law that a defendant is presumed innocent. The trial court refused to ask the veniremen whether they could accept that proposition and the Sixth Circuit reversed for this refusal. *Blount,* 479 F.2d at 651. However, the concurring judge in *Blount* felt that the trial court did enough by asking the jurors whether they would accept the charge of the court on the law as it applied to the evidence. *Id.* at 652.

The trial court's questioning was less extensive here than in any of the cases from other circuits which found the questioning adequate. No inquiry was made of the veniremen about the extent of their exposure to the case, although the amount of coverage may have made the trial court's assumption that everyone had heard about the case correct. Nevertheless, the answers to this question would have shed light on the credibility of other answers.

More important, the trial court did not ask the veniremen whether any had formed an opinion about the case. The number of persons answering affirmatively could have indicated the extent to which the minds of persons in the community had been "poisoned" by the publicity. *See Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037. If only a few persons said they had opinions, the trial court may have excused all of the veniremen so indicating. Depending on the number of persons responding affirmatively, further questioning may have been necessary to determine whether the opinions were light impressions or strong and deep impressions. *See United States v. Burr,* 25 F.Cas. at 51.

■ The voir dire here was not sufficient to determine the percentage of veniremen who had a preconceived opinion, *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037, and it was not sufficient to determine the strength of the opinions. The publicity was not such

---

**9.** The Eleventh Circuit follows the law of the old Fifth Circuit. *Bonner v. City of Prichard,*

661 F.2d 1206, 1207 (1981).

that it was inherently prejudicial. It was massive and pervasive, but mostly factual and some of it was as critical of defendants' chief accuser as it was of defendants. Therefore, questions about who held opinions would not necessarily have been futile; there might have been only a small number of veniremen holding opinions.

Admittedly, questioning as to the strength of opinions may have had to be done individually because of the possibility of contaminating the other veniremen. However, other circuits have acknowledged that individual questioning will at times be necessary. *See, e.g., Patriarca,* 402 F.2d at 318 (1st Cir.); *Silverthorne,* 400 F.2d at 639 (9th Cir.). *See also,* ABA Standards Relating to Fair Trial and Free Press, § 8–3.5 and commentary (Approved Draft 1978). On the other hand, trial courts may be under constitutional restrictions not to shut out the press and public from voir dire proceedings, *In re United States ex rel. Pulitzer Publishing Co.,* 635 F.2d 676, 679–80 (8th Cir.1980) (Gibson, J., concurring), raising questions about the propriety of calling a venireman to the bench for individual questioning.

While the issue of voir dire as it relates to obtaining an impartial and unbiased jury is often a close one, entailing the balancing of competing considerations, we here are driven to the conclusion that there was insufficient questioning of the veniremen to be able to conclude that they were impartial notwithstanding the massive pretrial publicity; and thus the defendants' fifth amendment right to due process and sixth amendment right to an impartial jury were violated.

D. Peremptory Challenges.

Another and further question arises in connection with the peremptory challenges. Even assuming that the voir dire met the constitutional standards, there remains the question of whether the voir dire was so inadequate that it impaired the right to exercise peremptory challenges under Fed. R.Crim.P. 24(b).

■ The Supreme Court has recognized the importance of peremptory challenges: "[P]eremptory challenge is a necessary part of trial by jury.... [T]he challenge is 'one of the most important of the rights secured to the accused ....'" *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), *quoting Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). Voir dire is essential in permitting the intelligent use of peremptory challenges, and the impairment of the peremptory challenge right is reversible error without a showing of prejudice. *Id.* 380 U.S. at 219, 85 S.Ct. at 835; *Johnson,* 584 F.2d at 155 (6th Cir.) (a trial court commits reversible error if by unduly restricting voir dire, it substantially impairs the peremptory challenge right). On the other hand, the purpose of the peremptory challenge is to obtain an impartial jury, not one sympathetic to a party's position. C. Wright, Federal Practice and Procedure § 381, at 332–33 (1982).

■ This court has stated that a party has a right to have a question asked during voir dire if an anticipated response would afford the basis for a challenge for cause. *Blount,* 479 F.2d at 651. Where veniremen have been exposed to prejudicial publicity, the nature and degree of the exposure is certainly a matter of legitimate concern to a defense attorney in deciding upon peremptory challenges. *Johnson,* 584 F.2d at 155. In the interest of expediency, "trial courts can ordinarily restrict voir dire on the subject of pre-trial publicity to the questioning of veniremen on the sources and intensity of exposure and the juror's ability to disregard the publicity in reaching a verdict." *Id.* The court in *Johnson* found the voir dire adequate because the defense had failed to establish a foundation for inquiry into recollection of prejudicial matter. *Id.* at 156.

According to *Johnson,* the voir dire can be limited to questions on (1) sources of exposure, (2) intensity of exposure, and (3) a venireman's ability to disregard the publicity. *Id.* at 155. The trial court only asked questions in the third area. And,

according to *Irvin,* this is the ultimate issue. 366 U.S. at 723, 81 S.Ct. at 1642. Viewed thusly, perhaps the first two questions are irrelevant once the third one is answered. However, we find this reasoning deficient, in ignoring two factors: (1) answers to the first two questions could help a trial court assess the credibility of a venireman's assurance that he could disregard the publicity, and (2) such information is certainly necessary to make an intelligent and meaningful use of the peremptory challenges.

█ The trial court's questioning did not help the defense counsel with peremptory challenges because an affirmative response to the question it asked would require the venireman be excused for cause. Information on whether a venireman had an opinion he felt he could put aside or the extent and nature of the publicity he encountered could have assisted defense counsel. In this case, we think the failure to ask such questions is an "impairment" requiring reversal. The fact that the court excused veniremen who said they had an opinion did not cure the deficiency in the questioning. That information was volunteered; it did not come in response to the court's questions. Therefore veniremen who held opinions might have gone undetected.

The implication in *Johnson* is that the failure to ask questions on the sources and intensity of exposure to pretrial publicity is an impairment of the peremptory challenge right. Likewise, the Third Circuit has stated that the parties have a right to some surface information which might furnish a basis for an intelligent exercise of peremptory challenges based on a lack of impartiality. *United States v. Segal,* 534 F.2d 578, 581 (3rd Cir.1976); *accord United States v. Baldwin,* 607 F.2d 1295, 1297 (9th Cir.1979). The Seventh Circuit also requires that the questions be more than conclusory; they must allow for intelligent exercise of peremptory challenges. *Dellinger,* 472 F.2d at 367–68.

█ On the other hand, an "impairment" of the peremptory challenge right could be seen as limited to situations where the number of challenges is effectively reduced when a trial court erroneously fails to excuse veniremen for cause. *See* C. Wright, Federal Practice and Procedure § 384, at 371, 371 n. 5 (1982). However, we agree with the implication in *Johnson* that the voir dire should provide some surface information so the parties can use their peremptory challenges in an intelligent or purposeful manner.

In the instant case, where there was substantial, even massive pretrial publicity, the voir dire should have been extensive enough to allow defendants to learn which veniremen were most exposed to publicity, from what sources that exposure came, and who held opinions. That information would have helped defendants detect suspected biases and use their peremptory challenges accordingly, helping to insure an impartial jury. The defendants had no information which would cause them to suspect biases which either were not strong enough for disqualification for cause or were not evident enough for the court to believe disqualification was in order. The lack of such information was an impairment of the peremptory challenge right, and would of itself require reversal.

We are not unmindful of the trial court's finding that the "jury selected is as fair and impartial a jury as could be obtained" and that a trial judge must be accorded considerable latitude and allowed a range of flexibility in impaneling a petit jury. Also we note that an appellate court will not interfere with the jury selection process absent an abuse of discretion. *Blount,* 479 F.2d at 651; *United States v. Owens,* 415 F.2d 1308, 1315 (6th Cir.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 406 (1970); *Silverthorne,* 400 F.2d at 638. Although the trial court's finding might be correct, there is no way on this record to probe that finding since the record is silent on the extent of the veniremen's exposure to the pretrial publicity and the depth and extent of their personal reactions to the massive publicity. We conclude as a matter of fairness that the court should have probed into the effect of the publicity upon the prospective jurors, both for challenges

for cause and for the exercise of peremptory challenges.

### III. Prosecutorial Misconduct

Our conclusion on the voir dire issue requires reversal and a remand to the district court for a possible retrial. However, one of the issues raised by defendants could require outright dismissal. Defendants argue that there was prosecutorial misconduct requiring dismissal of the indictment. They argue alternatively that Jack Ham's testimony should have been suppressed because of the prosecutorial misconduct. We hold that the prosecutors' conduct does not warrant dismissal of the indictment. For purposes of guidance on remand, we point out that we find no error in the trial court's failure to suppress Ham's testimony.

■ Defendants argue that there were several types of prosecutorial misconduct. The first alleged misconduct is the government's procuring of an agreement from the ABC not to revoke Ham's liquor license on the basis of truthful statements he gave at judicial proceedings.[10] Ham wanted this agreement because fraudulent acquisition of a license is grounds for revocation of the license.[11] The government convinced ABC officials that the best interests of all concerned would be served if Ham did not have to fear losing his license because of his testimony. Defendants argue that this agreement was improper in two ways. The first is that the agreement constituted mail fraud because under the agreement ABC officials were forgoing a statutory duty to investigate fraudulently obtained licenses.[12] The second is that the agreement violated 18 U.S.C. § 201(h) (1976), which prohibits the giving of something of value in exchange for testimony.[13]

We find defendants' claim to be without merit. First, the government committed no fraud by encouraging the ABC not to revoke Ham's liquor license. The government wanted the ABC to forgo revocation, and the ABC agreed to do so. State law does not require revocation,[14] so the decision regarding Ham's license did not interfere with any statutory duty on the ABC's part. The only duty which apparently was not adhered to was that of requiring the licensee to show cause why his license should not be revoked. However, the government did not ask the ABC to forgo this procedure. Perhaps if a "show cause" hearing had been

---

**10.** The executive director of the ABC wrote a letter to an Assistant United States Attorney on April 23, 1980, saying:

> It would be my recommendation in any future [ABC] proceedings that no punitive action by the [ABC] be taken against this individual [Jack Ham] or any license he might hold, including revocation of ABC retail license, because of his truthful testimony before the Grand Jury or future judicial proceedings in either the Federal or State Court's systems.

This letter was written without the knowledge of the ABC commissioners. The United States Attorney's office later contacted the three ABC commissioners, and they all stated orally that they did not intend to revoke Ham's license based on the manner in which it was obtained.

**11.** Tenn.Code Ann. § 57–3–104(c) (1980) provides:

> [The ABC] shall have and exercise the following functions, duties and powers, to wit:
>
> . . . .
>
> (2) To refuse to issue a license or permit if, upon investigation, it finds that the applicant for a license or permit has concealed or misrepresented in writing or otherwise any material fact or circumstance concerning the

operation of the business or employment, or if the interest of the applicant in the operation of the business or employment is not truly stated in the application, or in case of any fraud or false swearing by the applicant touching any matter relating to the operation of the business or employment. *If a license or permit has been issued, the commission shall issue a citation to the licensee or permittee to show cause why his license or permit should not be suspended or revoked.* (Emphasis added).

**12.** See note 11, *supra.*

**13.** 18 U.S.C. § 201(h) (1976) provides:

> Whoever, directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . .
>
> .   .   .   .   .
>
> Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

**14.** See note 11, *supra.*

held, the ABC would have allowed Ham to keep his license because of its prior commitment. Forgoing what could have been a futile hearing was not part of the promise the ABC made to the government. The government did not do anything to defraud the state of Tennessee of the fair and honest services of the ABC.

Likewise, we find no violation of § 201(h). The purported "thing of value" —a liquor license—was not offered by the government. The ABC director believed that the public interest would be served by exposure of possible corruption in the ABC during the Blanton administration. Admittedly, the government encouraged the ABC to adopt this viewpoint. But there was no evidence that it had anything at its disposal other than the power of persuasion; there is no evidence of any coercive power on the government's part. Therefore, the offer cannot be said to have come from the government.

Furthermore, even if the ABC were merely the agent of the government, the government did not "give" a thing of value. There was merely the preservation of the status quo. Regardless of whether or not Ham cooperated with authorities, the ABC could have allowed Ham to keep his license. We do not characterize the ABC's failure to exercise a discretionary power the "giving" of a thing of value. Therefore, the trial court properly declined to exercise its supervisory powers to dismiss the indictment or suppress Ham's testimony.

█ Defendants also allege prosecutorial misconduct in the government's not telling the grand jury about the ABC agreement. Ham appeared before the grand jury twice. The first time no mention was made of the ABC agreement. The second time the grand jury was told that the United States Attorney's office would inform the ABC of Ham's cooperation, but it was told that the ABC had already indicated a willingness to forgo action on Ham's license.

We also find this claim to be without merit. Although the government could have given a more complete description of its agreement with Ham, its failure to do so was not the type of extreme conduct required for dismissal of the indictment. *See United States v. Nembhard,* 676 F.2d 193, 199 (6th Cir.1982). Furthermore, the government is under no duty to provide evidence which would be favorable to the defendant, *United States v. Ruyle,* 524 F.2d 1133, 1135–36 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976), such as by undermining the credibility of government witnesses. *United States v. Trass,* 644 F.2d 791, 796–97 (9th Cir.1981). Therefore, the trial court neither had to dismiss the indictment nor suppress Ham's testimony; the courts are and should be reluctant to interfere in the executive functions of the prosecutor in making presentations to a grand jury.

Blanton alleges other prosecutorial misconduct in not telling the grand jury that Ham admitted lying about a $5,000 payoff to Blanton as well as other matters, and in not trying to resolve a conflict in testimony between Jack Ham and another government witness, Jack Ham's nephew, Bert. We again find no misconduct.

█ Blanton is wrong in asserting that the grand jury was not told about Ham's lying as to the $5,000 payment. The grand jury was fully informed that Ham believed he was mistaken about making the $5,000 payment to Blanton. This payment was not included in the indictment. As to other purported lies, Ham's statement that he told government representatives that he was lying is contradicted by the government representatives. The evidence of prosecutorial misconduct in this regard is insufficient to warrant dismissal of the indictment or suppression of the evidence.

The testimony of Bert Ham contradicted Jack's in that Bert said Jack skimmed profits and Jack denied the allegations. Blanton argues that one of the government witnesses, either Jack or Bert, had to be lying, and the government therefore violated the due process clause by presenting a witness it knew was lying. Blanton relies on *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir.1974), for the proposition that a party need not stand trial on an indictment based

on material perjured testimony. But in this case the perjury was not material; it was collateral to the issue of Blanton's guilt. Also, the government could not in this proceeding adjudicate who was truthful; it properly left the matter to the jury to resolve. Bert's testimony undercut the credibility of the government's chief witness, Ham. If Bert was the perjuror, the testimony only unfairly hurt the government's case. If Jack Ham did skim profits, the government weakened his credibility by presenting Bert's testimony. We fail to see how the conflict harmed Blanton; indeed, it may have helped him. Therefore, there was no prosecutorial misconduct warranting dismissal of the indictment or suppression of Ham's testimony.[15]

## IV. Other Issues

Our conclusions on the voir dire and prosecutorial misconduct issues dispose of the case. However, some of the other issues raised on appeal by defendants could reappear at a retrial, so we will address those issues.

### A. Change of Venue.

Only Blanton and Allen moved, pursuant to Fed.R.Crim.P. 21(a), for a change of venue, and only Blanton appeals on this issue. Blanton specifically moved for a change of venue from the Middle District of Tennessee to the Eastern District of Tennessee. The trial court denied both defendants' motions.

■■■ A grant or denial of a change of venue motion is a matter within the discretion of the trial judge. *United States v. Etheridge,* 424 F.2d 951, 967 (6th Cir.1970), *cert. denied,* 400 U.S. 993, 1000, 91 S.Ct. 463, 885, 27 L.Ed.2d 422, 830 (1971), *cert. dismissed sub nom. Bostic v. United States,* 402 U.S. 547, 91 S.Ct. 2174, 29 L.Ed.2d 102 (1971). A more thorough voir dire on the publicity issue would have better shown whether there was a need for a change of venue. The court had the power to change the venue to a location outside Tennessee even though Blanton specifically requested the Eastern District of Tennessee. Fed.R. Crim.P. 21(a). If, on remand and after attempting voir dire, the district court should conclude that a change of venue is still necessary in order to accord the defendants a fair trial, it is free to order a change of venue at that time. *Johnson,* 584 F.2d at 154 (6th Cir.1978). However, the record before us does not show that a more inquisitive voir dire would necessarily be insufficient to protect defendants' right to an impartial jury.

### B. Severance of Hood.

Hood appeals the trial court's denial of his motion to sever pursuant to Fed.R. Crim.P. 14. Hood argues that the voir dire was insufficient for the trial court to determine whether juror prejudice toward Blanton would prejudice Hood.

■■■ The decision to grant or deny a severance is a matter of discretion for the trial court. *Etheridge,* 424 F.2d at 967. A more thorough voir dire on the publicity

---

**15.** Defendants alleged another instance of prosecutorial misconduct in a separate appeal from an order of the court below. That appeal stemmed from the revocation of Ham's immunity during the course of the trial. The government revoked Ham's immunity after concluding that Ham lied when he denied skimming profits. On May 16, 1981, almost one month into the trial, the government revoked Ham's immunity and Ham was indicted two days later. After the trial, Ham successfully sought to have the indictment dismissed on the basis that the immunity revocation was improper. Evidence adduced at a hearing on Ham's motion to dismiss indicated that the indictment might have been a ploy by the government to show the jury that Ham was being forced to obey his immunity agreement. Defendants felt this revelation was new evidence of prosecutorial misconduct and sought a new trial. The trial court lacked jurisdiction to grant a new trial because the instant appeal had already been filed, and the court refused to certify to this court that it was inclined to grant the motion. The trial court made that ruling because defense counsel insisted that the jury be told about the indictment and the indictment would not help the government's case. Defendants appealed the trial court's refusal to certify, which was consolidated with the instant appeal for purposes of oral argument. We disposed of the appeal from the refusal to certify on procedural grounds, finding the trial court's order unappealable. *United States v. Blanton,* 697 F.2d 146 (6th Cir.1983).

issue would reveal whether there was any prejudice against Blanton that the jurors could not put aside and it might reveal whether such prejudice would affect Hood. However, the nature of the case does not appear to be such that negative attitudes toward Blanton would necessarily affect Hood. Indeed, Hood was acquitted on three counts on which Blanton was found guilty. Even with the voir dire as conducted, there was not enough evidence from other sources to show prejudice toward Hood which would require severance.

## C. Jury Instructions.

Defendants Allen and Hood make two complaints about the jury instructions. The first is that the court erred in charging the jury that the government did not violate the law prohibiting the bribing of witnesses (18 U.S.C. § 201(h)) by obtaining the commitment from the ABC regarding Jack Ham's liquor license. As we stated in Section III, this was a correct statement of the law. Therefore, we find no error in this instruction.

■■■ Defendants also complain of the instruction that the alleged scheme to violate Tennessee liquor laws (those prohibiting office holders and public employees from having an interest in liquor stores and prohibiting concealed interests) would be a scheme to defraud.[16] Defendants argue that the jury should have been permitted to decide for itself whether defendants' acts constituted a scheme to defraud because this was a question of fact for the jury.

We believe the instruction was proper. It did not remove from the jury the determination of an essential matter. The district court merely defined a scheme to defraud, and it did so by saying that the scheme alleged to have been conducted would be a scheme to defraud under the mail fraud statute. Other circuits have approved instructions that define a scheme to defraud in the context of the facts of the case. *United States v. Bush,* 522 F.2d 641,

651, 651 n. 10 (7th Cir.1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *see United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.) (Hand, J.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932).

## D. Exclusion of Testimony.

■■■ Finally, Blanton argues the trial court made incorrect evidentiary rulings in limiting the testimony of some of his witnesses. Blanton called fifteen witnesses who were prepared to testify that Blanton was free from corruption; most of these witnesses were members of his cabinet. Blanton wanted to call these witnesses to rebut the allegation in the indictment that Blanton was out to defraud the citizens of Tennessee of the honest services of their governor. The court allowed one person to so testify, but ruled that the testimony of the other witnesses would be limited to showing how little of Blanton's time was devoted to ABC matters and how little time he would have had to devote to these matters. The court felt the questioning desired by Blanton would allow the government to bring up corruption in areas other than the ABC, and this could prejudice the other defendants. The court also felt that the questions would not be relevant because the court intended to charge the jury to consider only corruption in the ABC, and it did so.

The trial court weighed the probative value of the evidence against its danger of unfair prejudice pursuant to Fed.R.Evid. 403 and concluded that the testimony should be limited to certain areas. A trial court's evidentiary ruling will be disturbed on appeal only when there is a grave abuse of discretion. *United States v. Jenkins,* 525 F.2d 819, 824 (6th Cir.1975). The court's weighing was reasonable and clearly not an abuse of discretion.

## V. Conclusion

■■■ It is fundamental in our system of justice that a defendant has the right to a

---

**16.** The trial court described the state laws which were allegedly violated and then said: "The defendants deny that they or either of them entered into a scheme to violate such liquor laws. We charge you that a scheme or plan to violate these laws in this manner would be a scheme to defraud."

trial by an impartial jury. A prominent defendant has no greater right than any other citizen. But in a highly publicized case steps must be taken that would not be necessary in the ordinary case to ensure that the defendant stands trial before a group of impartial jurors. The right to an impartial jury is so important that we require that the record show that adequate steps were taken to make sure the jurors were unbiased. We reluctantly conclude that the trial court did not ask sufficiently adequate questions to be able to find that the jurors could put aside opinions they might have formed as a result of the massive publicity. The questioning was insufficient to detect biases in this case so that counsel could make a reasonable and intelligent use of their peremptory challenges. The extent and depth of the venire exposure to the massive and lengthy publicity was not probed, resulting in an impairment of defendants' rights to a fair and impartial jury as shown on the record.

The convictions are reversed and the case remanded to the district court for further proceedings.