**Timothy Wesley McCORQUODALE, Petitioner-Appellant,**

v.

**Charles BALKCOM, Warden, Georgia State Prison, et al., Respondents-Appellees.**

No. 82–8011.

United States Court of Appeals, Eleventh Circuit.

May 31, 1983.

As Amended June 10, 1983.

Opinion on Granting of Rehearing En Banc June 30, 1983.

John R. Myer, Atlanta, Ga., John Charles Boger, Anthony Amsterdam, New York City, for petitioner-appellant.

H. Allen Moye, Janice G. Hildenbrand, Asst. Atty. Gen., Atlanta, Ga., for respondents-appellees.

Before KRAVITCH, HATCHETT, and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Timothy Wesley McCorquodale was tried and convicted of first-degree murder by a jury in the Superior Court of Fulton County, Georgia.[1] The judge, acting upon the

---

1. The facts have been summarized in the published opinion of the Georgia Supreme Court, *McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974). We therefore deem it sufficient to emphasize the Georgia court's conclusion that,

"In no case we have reviewed has the depravity of the defendant and the torture of the victim exceeded that established by the evidence and testimony of the witnesses in this case." We recite only such additional facts as are

jury's recommendation of the death penalty, sentenced appellant to death. On direct appeal, the Georgia Supreme Court affirmed the conviction and sentence. *McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3223, 49 L.Ed.2d 1218 (1976). Subsequently, a petition for writ of habeas corpus was filed in state court, and the same was denied, *McCorquodale v. Stynchcombe,* 239 Ga. 138, 236 S.E.2d 486, *cert. denied,* 434 U.S. 975, 98 S.Ct. 534, 54 L.Ed.2d 467 (1977). Appellant also sought unsuccessfully to obtain a new trial by extraordinary motion, *McCorquodale v. State,* 242 Ga. 507, 249 S.E.2d 211 (1978). McCorquodale then sought habeas corpus relief in the federal courts by filing a petition for the writ in the United States District Court for the Northern District of Georgia, attacking both his conviction and death sentence, *McCorquodale v. Balkcom,* 525 F.Supp. 408 (N.D.Ga.1981). Appellant appeals the district court's denial of his habeas corpus petition.

In his petition, McCorquodale contends (1) that his written statement was improperly admitted because (a) his arrest was unlawful and (b) his statement was involuntary; (2) that the trial court's instruction on intent operated unlawfully to shift the burden of proof from the state to the defendant; (3) that the jury which tried his guilt or innocence was prosecution-prone; (4) that he was erroneously denied a full evidentiary hearing on his claims that the Georgia capital punishment statute is applied in an arbitrary and racially discriminatory fashion; (5) that the district attorney's remark to the sentencing jury regarding appellate review violated petitioner's due process right to a fundamentally fair trial; and (6) that he was denied a fair and impartial sentencing jury in violation of the sixth and fourteenth amendments, pursuant to the interpretations given by the Supreme

Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny. We address each issue seriatim.

■ Petitioner first contends that the improper admission of his statement mandates the reversal of his conviction. The trial court conducted a suppression hearing on this issue. A review of that proceeding and the record as a whole leads us to affirm the district court and deny petitioner's requested relief. No unlawful arrest occurred. Pursuant to information obtained from two reliable informants, McCorquodale was taken to the police station for questioning. *See generally Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Neither was his statement involuntary.[2] The totality of the circumstances indicate no abusive or excessive questioning, no mental impairment on the part of the defendant. *See generally Jurek v. Estelle,* 623 F.2d 929 (5th Cir.1980) (en banc).

■ Petitioner's second contention also attacks his conviction. In *Connecticut v. Johnson,* —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), the Supreme Court addressed the burden-shifting instruction on intent[3] and whether such an error can be harmless. Although a plurality opinion, *Johnson* states that "a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless. We leave it to the lower courts to determine whether, by raising a particular defense or by *his other actions,* a defendant himself has taken the issue of intent away from the jury." *Id.* at ——, 103 S.Ct. at 978 (citations and footnotes

---

relevant to the specific issues raised in this appeal.

**2.** Although not decisive of the ultimate issue, we note McCorquodale's perception that his statement was voluntary and made in the absence of any threats. Trial Transcript 246.

**3.** This issue is known as the *Sandstrom* issue. *See Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

omitted) (emphasis added). Under the peculiar circumstances of this case, we find that the defendant's insistent assertions of guilt effectively withdrew the issue of intent from the jury.

During the defense's opening statement, counsel stated to the jury that, "[W]e've been here trying to plead guilty for two days." [4] Trial Transcript 468. He went on to say, "[W]e are guilty. We know it. It's that simple. And I think when you go throughout this trial and throughout this whole hearing you'll never hear any statement from us other than that." Trial Transcript 469. Defense counsel maintained the same position in his closing argument, stating, "Yes, he killed her." Trial Transcript 700. "[H]e's guilty of the crime of murder." Trial Transcript 702. In conclusion, McCorquodale's attorney stated, "Try in your mind to ascertain what you believe happened out there and I think you will find him guilty. Thank you." [5] *Id.* Thus, we refuse to overturn McCorquodale's conviction on the basis of an alleged erroneous instruction of intent.

■ Also without merit are appellant's third and fourth assertions of error. In *Smith v. Balkcom,* 660 F.2d 573 (5th Cir. Unit B 1981), *modified,* 671 F.2d 858 (5th Cir. Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), we rejected the argument that the exclusion of jurors unalterably opposed to the death penalty results in the creation of an unconstitutionally guilt-prone jury. 660 F.2d at 575–79. In *Smith,* we also held that in light of the evidence proffered, no evidentiary hearing was required on the issue of the arbitrary and discriminatory imposition of the Georgia capital punishment statute. 660 F.2d at 584–85, *modified,* 671 F.2d at 859–60. As in *Smith,* the statistics proffered in the instant case are incomplete. The tables do not take into account the various statutory aggravating circumstances such as the "wantonly vile, horrible, [and] inhumane" [6] torture-murder evidenced here. We therefore hold that the district court correctly refused to conduct further evidentiary hearings on petitioner's proffered evidence.

■ Appellant's fifth contention, that the prosecutor's improper remark to the sentencing jury regarding appellate review [7] required a vacating of petitioner's sentence, is likewise devoid of merit. The trial court gave a curative instruction. [8] *Prevatte v. State,* 233 Ga. 929, 214 S.E.2d 365 (1975). In the context of the entire trial, the remark was not sufficiently prejudicial so as to render the trial fundamentally unfair. *E.g., Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Jones v. Estelle,* 622 F.2d 124 (5th Cir.), *cert. denied,* 449 U.S. 996, 101 S.Ct. 537, 66 L.Ed.2d 295 (1980).

■ Appellant's sixth contention requires that we scrutinize those portions of the record pertaining to jury selection. [9] Near

---

4. Before voir dire in the instant case, defense counsel tried to enter a plea of guilty and have the court pass sentence. The court rejected the plea. Defense counsel also attempted to waive a jury trial and have the court pass on guilt and sentence. The court refused to allow such a waiver.

5. Defense counsel also attempted to waive a jury at the sentencing stage. The court refused to allow this waiver.

6. Off.Code Ga.Ann. sec. 17–10–30(b)(7) (1982).

7. At the sentencing hearing, the prosecutor made the following remark during closing argument: "But, you have a contribution to make. A vital contribution which you are now considering and will be deliberating on. And after your decision, the Appellate Court will have a very important responsibility." Trial Transcript 766. Counsel for petitioner immediately objected and moved for mistrial. *Id.* The motion was denied. Trial Transcript 769.

8. The court characterized the remark as "highly improper," Trial Transcript 770, and urged the jurors to give it "no consideration whatsoever." Trial Transcript 771.

9. We recognize that appellate courts do not lightly interfere with the jury selection process and that trial judges are accorded great deference in this area. *E.g., United States v. Holman,* 680 F.2d 1340 (11th Cir.1982); *United States v. Hawkins,* 658 F.2d 279 (5th Cir. Unit A 1981). However, on an issue as vital to our jurisprudence as *Witherspoon,* this court is not precluded from scrutinizing the record in an effort to ascertain the correctness of the trial court's finding regarding the veniremen's convictions on capital punishment. In *Aiken v. Washington,* 403 U.S. 946, 91 S.Ct. 2283, 29 L.Ed.2d 856 (1971), the Supreme Court in a

the beginning of the voir dire of approximately 60 jurors, the veniremen were asked collectively whether they were conscientiously opposed to capital punishment and, if so, to stand. Nineteen prospective jurors responded. The district attorney then instructed this group that he intended to ask two additional questions and if the answer to either was affirmative, to step forward. The first question posed was, "Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case, regardless of what the evidence was?" The second question was, "Would you allow your opinion about capital punishment to prevent you from being a fair and impartial juror on the issue of guilt or innocence as distinguished from the issue of punishment?" The district attorney then moved the court to excuse for cause the 15 prospective jurors who had stepped forward, and the court granted that motion over defense counsel's objections.[10]

These facts present difficult questions regarding the application of *Witherspoon*. We must determine whether the three questions posed by the district attorney were sufficient under the mandates of *Witherspoon*, particularly in the absence of individual questioning of prospective jurors.[11]

---

10. Ladies and gentlemen, I want to address to you now, three questions and if your answer to the first question is, yes, will you please stand. If your answer to this question is no, will you please remain seated.

> The question is this. Are you conscientiously opposed to capital punishment? If you're conscientiously opposed to capital punishment, if you will, please stand. If you are not conscientiously opposed to capital punishment, remain seated.

> All right, now all the jurors who are conscientiously opposed to capital punishment, please stand. Now ladies and gentlemen, those of you who are standing, those who are standing and who have indicated by doing so that you are conscientiously opposed to capital punishment, I'd like to address to you two additional questions. If your answer to either of these questions is, yes, I'd like to, if you would, please simply step up to the rostrum.

> If your answer is no to both questions, then please remain where you are.

> The first question is this. Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case, regardless of what the evidence was?

> MR. RIDLEY: I object. That's not a proper question.

> MR. ENGLAND: Yes, it is a proper question, if your Honor please.

> If your answer is yes to the question, please step forward to the rostrum.

> Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case regardless of the evidence?

> And would the others still remain standing; those who are standing.

memorandum opinion reversed the death sentence and remanded to the state court based on *Witherspoon*. The state court opinion on review had found no *Witherspoon* violation based in part on deference to the trial judge.

> Let me address this last question to the other ladies and gentlemen who were standing. Everybody who was standing.

> THE COURT: This is addressed to the ones who are standing, but who have not come forward.

> MR. ENGLAND: This is addressed to every juror who has not come forward but who has indicated by standing, that you are conscientiously opposed to capital punishment.

> The question is this. Would you allow your opinion about capital punishment to prevent you from being a fair and impartial juror on the issue of guilt or innocence as distinguished from the issue of punishment? If you would, would you please step forward.

> If your Honor please, in relation to these ladies and gentlemen who have stepped forward in response to the questions, I would respectfully move to the Court that they be allowed to be excused for cause.

> MR. RIDLEY: If the Court please, to which we would object to their being excused. We make the objection for each and every juror who is standing, the same objection; we would object to them being excused for cause.

> THE COURT: Overrule such objection.

> THE SHERIFF: Would you call off your names and panel numbers starting from here (indicating). . . .

Trial Transcript 278–81.

11. Posing questions to the group en masse and accepting non-verbal responses, evidenced by sitting or standing, is what we condemn. This procedure denied McCorquodale his constitutional right to procedural due process, as well as his Sixth Amendment right to trial by an impartially chosen jury. *Witherspoon* requires a showing that:

> Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.

*Witherspoon,* 391 U.S. at 515–16 n.9, 88 S.Ct. at 1773–4, n.9, 20 L.Ed.2d at 781, n.9 (1968).

In *Witherspoon v. Illinois,* the Supreme Court said:

Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.[21] No defendant can constitutionally be put to death at the hands of a tribunal so selected.

[21] Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. See nn. 5 and 9, supra.

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as oppose [sic] to the *sentence,* in this or any other case.

12. In *United States v. Blanton,* 700 F.2d 298 (6th Cir.1983), the court reviewed the background question of conducting voir dire without individually questioning jurors. Under the circumstances presented in that case, the court found an en masse questioning of jurors on the issue of pretrial publicity to be inadequate to detect resulting prejudice.

391 U.S. at 522, 88 S.Ct. at 1776, 20 L.Ed.2d at 784–85 (emphasis in original; footnote 22 omitted).

It is our task to determine whether the group questioning of the jury in the manner conducted here sufficiently complied with the *Witherspoon* test.[12] Were veniremen excluded "for cause simply because they voiced general objections to the death penalty"? Was it determined here whether a juror would "be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances"? Can one readily conclude that "the only veniremen who were in fact excluded for cause were *those who made unmistakably clear* ... that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them"?

In our analysis, we turn for assistance to *Burns v. Estelle,* 626 F.2d 396 (5th Cir.1980) (en banc),[13] where the court, relying upon *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), had the following to say after a discussion of the incomplete questioning of a juror:

Further questioning, which was denied, might well have either revealed that she could lay her personal views aside, follow the court's instructions, and do her duty as a citizen or made unmistakably clear that she could not or would not do so. What her answers might have been will never be known. She was therefore prematurely excused, with the showing required by *Witherspoon* for her dismissal incomplete. Since she was, Burns' death sentence cannot be carried out....

626 F.2d at 398.

■ As in *Burns,* we hold that the jurors in this case were prematurely excused. The

13. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all the decisions that the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

requirement that it be made unmistakably clear that the jurors would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them was not met. None of the jurors were given an opportunity to demonstrate a "willing[ness] to consider all of the penalties provided by state law" or an opportunity to demonstrate an absence of any "irrevocabl[e] commit[ment], before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21.

The fact that the jurors were questioned as a group compounds the chances for misunderstanding. The individual is not able to request further explanation or indicate that he does not understand the question.[14]

Courts have addressed the issue of group directed voir dire in the somewhat similar context of pretrial publicity cases.[15] After surveying various Supreme Court and circuit court opinions, the Sixth Circuit concluded, "What most courts consider the most important element in determining whether a presumption of prejudice should

arise is the *strength* of the venireman's opinion which he is asked to set aside." *United States v. Blanton,* 700 F.2d 298, 305 (6th Cir.1983) (emphasis supplied).

In appellant's case, the *strength* of the group-questioned veniremen's opinions is impossible to ascertain. One juror, who was questioned individually during the voir dire occurring after the group of 15 had been excused for cause, stated that he had not understood a question posed to him regarding his ability to base his verdict on the evidence presented and the law given by the court. The juror obviously had not understood the group questioning since further probing resulted in four replies that he could not vote for the death penalty under any circumstances.[16]

■ As the Supreme Court stated in *Witherspoon,* "The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors." *Witherspoon,* 391 U.S. at 515–16 n. 9, 88 S.Ct. at 1774 n. 9, 20 L.Ed.2d at 781 n. 9. In the case today, the lack of a follow-up inquest after the initial inquiry requires reversal.[17] A trial court

---

**14.** This potential for misunderstanding is evidenced in *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), where the court said:

> Of the five veniremen whose exclusion *Granviel* challenges, the district court held, in accordance with the magistrate's recommendation, that one venireman, Donald L. Harrison, was improperly excused for cause for merely voicing conscientious scruples against the death penalty. We, too, believe that Harrison's exclusion for cause constituted a *Witherspoon* violation. He was first asked whether · he had conscientious scruples against the infliction of the death penalty, whereupon he stated, "I don't know what that means." When asked if he could ever vote to inflict the death penalty, he replied, "No, I don't *think* I could." Then, in response to the question, "You just don't *feel* like you would be entitled to take another person's life in that fashion?" He nodded and then said, "No, I could not." These questions and answers fall far short of an affirmation by Harrison that he would automatically vote against the death penalty regardless of the evidence, or that his objec-

tions to capital punishment would prevent him from making an impartial decision as to guilt.

655 F.2d at 677 (emphasis in original; footnotes omitted).

**15.** The mandates of *Witherspoon,* unlike the pretrial publicity cases, necessarily involve the composition of a jury specifically empanelled to determine whether a man deserves to live or die should he be found guilty of the underlying crime.

**16.** Trial Transcript 402–03 (voir dire of juror Kidd).

**17.** In pretrial publicity cases in this circuit, the approved test is for the judge to determine what information the prospective jurors have received, to inquire into the prejudicial effect of such information, and to make an independent determination regarding the panel member's impartiality. *E.g., United States v. Davis,* 583 F.2d 190 (5th Cir.1978). Qualifying *Davis,* the court in *United States v. Gerald,* 624 F.2d 1291 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), stated that the individual voir dire described in *Davis* generally is not necessary where appellant makes unsupported general allegations of prejudice or

must determine that the juror understands the difficult distinction between possessing a personal opinion regarding capital punishment and the ability to subordinate that view in order to perform his duty as a juror. In order to ascertain that a juror understands this distinction, we hold that a trial court must require a thorough and informative questioning of each juror.[18]

*Excusal of Woodlief and Kidd*

After the excusal for cause of the group of 15 veniremen, the prosecutor began individually questioning the remaining veniremen. Upon receiving an affirmative answer to the question of whether Miss Woodlief would base her verdict on the evidence and the law, the prosecutor asked the juror whether she really believed in capital punishment. Miss Woodlief answered in the negative, stating that she had first thought under certain situations she could vote for the death penalty but that now she did not "think" she could do it. Trial Transcript 401. She was then excused without further questioning.[19] No mention was made of an automatic vote or whether she could lay aside her personal view. In *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), the Fifth Circuit held insufficient a similar colloquy.

The very next juror was also excused for cause. There, Mr. Kidd stated that he did not think he could vote for the death penalty under any circumstances. In Mr. Kidd's case, the court attempted to ascertain the strength of the juror's opposition to capital punishment by repeating the question three times. Each time Mr. Kidd stated unequivocally his inability to vote for the death penalty, and the court then excused him.[20]

■ Thus, although it appears that Mr. Kidd was correctly excused under the *Witherspoon* rule, the questioning of Miss Woodlief was insufficient. The excusal of Miss Woodlief provides an additional reason for the vacating of the sentence in this case. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

For the foregoing reasons, we reverse and remand to the district court with directions to issue the writ of habeas corpus, subject to the state's right to hold a resentencing hearing within a reasonable time.[21] *Goodwin v. Balkcom,* 684 F.2d 794, 820 (11th Cir.1982).

where no significant potential of prejudice exists. *Id.* at 1298. The general rule is, thus, that group questioning suffices to determine whether jurors had prior knowledge of the case—it is the absence of an exploratory examination of those jurors responding affirmatively to the group questioning that resulted in reversals in *Davis* and similar cases. *E.g., United States v. Hawkins,* 658 F.2d 279 (5th Cir. Unit A 1981).

**18.** The requirment that a trial judge determine a juror's understanding of the *Witherspoon* inquiry is similar to the requirement of Rule 11 of the Federal Rules of Criminal Procedure that a court, before accepting a plea of guilty, "address the defendant personally in open court and inform him of and determine that he understands [certain rights to which he is entitled]." Fed.R.Crim.P. 11 (1983). Interpreting Rule 11, the court in *Mack v. United States,* 635 F.2d 20 (1st Cir. 1980), stated:

Although the district court informed Mack of the charges, it did not determine that the defendant understood the nature of the charges. Simply informing a defendant of the charges does not "establish on the record that the court personally determined that the defendant *understood* the charges." *United States v. Wetterlin,* 583 F.2d at 350 n.6. Furthermore, "[r]outine questioning or a

single response by the defendant that he understands [the nature] of the charge is insufficient," *Woodward v. United States,* 426 F.2d 959, 962 (3d Cir. 1970). The court should "engage in extensive an interchange as necessary to assure itself and any subsequent reader of the transcript that the defendant does indeed fully understand the charges." *United States v. Coronado,* 554 F.2d at 173.
635 F.2d at 26.

**19.** Defense counsel immediately objected to the excusal. Trial Transcript 401.

**20.** Defense counsel also entered a contemporaneous objection to this excusal. Trial Transcript 404.

**21.** When the district court fixes the time within which to conduct the resentencing hearing, it should take into account the inherent difficulty in locating former witnesses after such a lengthy passage of time. However, in the event the witnesses cannot be located, we note the possibility of employing Ga.Code Ann. sec. 38–314 (1981). *See, e.g., Rini v. State,* 236 Ga. 715, 225 S.E.2d 234, *cert. denied,* 429 U.S. 924, 97 S.Ct. 326, 50 L.Ed.2d 293 (1976); *Gibson v. State,* 160 Ga.App. 615, 287 S.E.2d 595 (1981).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I concur in all portions of the majority opinion except its resolution of the *Witherspoon* issue. On that issue, I respectfully dissent.

The majority correctly notes that the Supreme Court in *Witherspoon* stated:

[N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made *unmistakably clear* (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would *prevent* them from making any impartial decision as to the defendant's *guilt*.

*Witherspoon v. Illinois,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (some emphasis added and some in original).

Under this standard, the voir dire examination in the instant case complied with the *Witherspoon* mandate: each and every potential juror excused for cause due to their attitude toward the death penalty made "unmistakably clear" in response to precise questions that their views would *prevent* their impartial decision in either the penalty or guilt phase of the trial.

Two novel issues in the *Witherspoon* context are presented: whether *Witherspoon* requires that the voir dire questions be propounded to each juror individually and whether the responses must be verbal. Neither issue has been decided by this circuit [1] or the Supreme Court. Although individual voir dire and verbal responses usually are preferable, they are not the touchstone of *Witherspoon* compliance.[2] More

important than form is the substance of both the inquiry and responses: that the questions precisely and unambiguously instruct the jurors as to the *Witherspoon* qualifications and that the jurors' responses be clear and unequivocal. In most instances the most definite response will be in a verbal form. Verbal responses however are not talismans for clarity. They are often fraught with ambiguity. Much turns on the tone of voice, the facial expression and the demeanor of the venireperson as the response is delivered. Even a simple 'yes,' although on a cold written record appearing crystal clear, can be delivered in a manner that conveys doubt. For this reason, when as here the questions asked were precise and closely tracked the *Witherspoon* standards, deference should be given to the trial court's assessment of whether the responses made clear that the objection to the death penalty was of a degree to warrant excusing the potential juror. *See Irvin v. Dowd,* 366 U.S. 717, 723–24, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961) (trial court's finding of strength of prospective juror's opinion based on publicity should not be set aside unless error is 'manifest'); *United States v. Robbins,* 500 F.2d 650, 653 & n. 3 (5th Cir.1974) [3] (ruling on suggestions of impartiality is within discretion of trial court and abuse of that discretion must be clear to warrant reversal).

The rationale does not differ when the responses are nonverbal. As with verbal answers, nonverbal responses can and must be assessed for the demeanor, facial expression and degree of hesitancy, or lack thereof, evidenced as the response is made. In this regard an appellate tribunal should defer to the trial judge who was present. An appellate court is handicapped to do otherwise. *See Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981); *Irvin v. Dowd,* 366 U.S. at 723–24, 81 S.Ct. at 1642–43; *United*

---

1. *Cf. Goodwin v. Balkcom,* 684 F.2d 794, 816 (11th Cir.1982) ("[I]t may be possible in some instances for a court to decide that a response other than verbal is unquestionably unambiguous").

2. I find no precedent for a holding, and do not read the majority as enunciating a rule, that

nonverbal responses can never satisfy the exacting standards of *Witherspoon.*

3. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*States v. Robbins,* 500 F.2d at 653 n. 3, quoting *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878).

In *Burns v. Estelle,* 626 F.2d 396 (5th Cir.1980), on which the majority relies, the court determined it was error under *Witherspoon* to excuse a venireperson who was asked only whether her views on the death penalty would "affect" her decision. Affirming that her views would " 'affect' her deliberations, with little or no indication of how profound that effect would be ... was not enough." *Id.* at 398. The questions addressed to the venireperson in *Burns* did not clearly and precisely pose the critical *Witherspoon* issue: would the venireperson's attitude toward the death penalty *prevent* her from making an impartial decision as to guilt or innocence or cause her *automatically* to vote against the death penalty *regardless* of the evidence. *Witherspoon,* 391 U.S. at 522, 88 S.Ct. at 1777. In *Burns,* failure to pose the question at any point in the voir dire meant the venireperson was "prematurely excused," *Burns v. Estelle,* 626 F.2d at 398, and further questions were required. *See also Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

In contrast, here the prosecutor's questions were unconvoluted, precise and directly posed the crucial *Witherspoon* issues. The majority points to no flaw in the questions.[4] After explaining to the venire that three questions would be asked and asking them to stand up if their answer to the first was 'yes,' the prosecutor enunciated the following query:

The [first] question is this. Are you conscientiously opposed to capital punishment? If you're conscientiously opposed to capital punishment, if you will, please stand. If you are not conscientiously opposed to capital punishment, remain seated. [Nineteen of approximately sixty persons rose].

Trial Transcript at 279. This clearly is a proper initial *Witherspoon* question, geared

at identifying those to whom further questioning should be directed. The prosecutor then proceeded.

All right, now all the jurors who are conscientiously opposed to capital punishment, please stand. Now ladies and gentlemen, those who are standing and who have indicated by doing so that you are conscientiously opposed to capital punishment, I'd like to address to you two additional questions. If your answer to either of these questions is, yes, I'd like to, if you would, please simply step up to the rostrum. If your answer is no to both questions, then please remain where you are.

The first question is this. Would you allow your opinion about capital punishment to *prevent* you from voting for the death penalty in this case, *regardless of what the evidence was*? [At this point defense counsel objected on the ground that this question was improper and then the questioning proceeded with the prosecutor repeating the same question].

Would you allow your opinion about capital punishment to prevent you from voting for the death penalty in this case regardless of the evidence? [At this time some of the jurors standing stepped forward and the prosecutor asked all those who had stood in response to the first question to remain standing]. . . .

This is addressed to every juror who has not come forward but who has indicated by standing, that you are conscientiously opposed to capital punishment.

The question is this. Would you allow your opinion about capital punishment to *prevent* you from being a fair and impartial juror on the issue of guilt or innocence as distinguished from the issue of punishment? If you would, would you please step forward. [Here some of the remaining jurors standing stepped forward. In all, fifteen of the nineteen persons who had stood up had stepped forward and were excused for cause. Four did not step forward and were not ex-

---

4. The questions here stand in sharp contrast to those articulated in *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982) on which the majority relies. *See* Maj.Op. at 1560. The questions there posed were ambigu-

ous and the venireperson indicated confusion and lack of understanding. Here the questions succinctly and clearly posed the critical *Witherspoon* inquiry and the record reveals no hesitation or confusion on the part of any venireperson. *See* text *infra,* at 1564.

cused for cause. Defense counsel objected generally].

Trial Transcript at 279–81 (emphasis supplied). *See McCorquodale v. Balkcom,* 525 F.Supp. 408, 424 (N.D.Ga.1981).

The majority holds that, as in *Burns,* the venirepersons were excused prematurely. However, no further questions could have posed the relevant inquiry more effectively.[5] The critical questions were asked immediately. In my view, proceeding directly to the relevant issues fosters understanding by the jurors who are saved the confusion engendered by precatory questioning that misses the *Witherspoon* mark.

Defense counsel here, unlike in *Burns,* 626 F.2d at 397–98 n. 2, made no suggestions of any further questions that should be asked. Rather counsel objected only generally to the form of the questions, and to the dismissal of the jurors as a whole. If the basis for any further objection existed, e.g., hesitation on the part of those stepping forward, the burden was on defense counsel to raise the issue. *Cf. Goodwin v. Balkcom,* 684 F.2d at 816 (11th Cir.1982) (failure of defense counsel to raise *Witherspoon* violation is evidence of ineffectiveness).[6]

Under these circumstances, I would hold that one who, without hesitation,[7] stood up and then stepped forward in response to these precise questions was stating unequivocally and unambiguously that in no event would he or she vote to impose the death penalty or that his or her views on the death penalty would prevent an impartial determination of guilt or innocence.

The second issue raised is the collective questioning of the venire. Although no case has decided the propriety of such questioning in the *Witherspoon* context, as the majority notes cases have addressed the issue in determining the impact of pretrial publicity.[8] *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Hawkins,* 658 F.2d 279 (5th Cir. 1981); *United States v. Gerald,* 624 F.2d 1291 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

Generally, the method of voir dire examination is committed to the sound discretion of the trial courts, limited by the requirements of due process. *United States v. Hawkins,* 658 F.2d at 283; *United States v. Gerald,* 624 F.2d at 1296; *United States v. Delval,* 600 F.2d 1098, 1102 (5th Cir.1979). *See Irvin v. Dowd,* 366 U.S. 717, 723–24, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). The trial court's discretion includes the decision whether voir dire should be conducted collectively or individually, *United States v. Gerald,* 624 F.2d at 1296, and no different rule is required when *Witherspoon* qualification is in issue.

In *United States v. Davis,* 583 F.2d 190 (5th Cir.1978), in light of extensive pretrial publicity, the trial court asked any venireperson who felt that the publicity had impaired his ability to render an impartial decision to raise his hand. When none responded the court refused defense counsel's request to examine each venireperson individually. *Id.* at 196. In overturning the convictions the Fifth Circuit stated: "Though separate examination of jurors is sometimes preferable, it is not necessarily required." *Id.* at 196–97 (footnotes omitted). However, on the facts of *Davis* where only one question was asked and the ques-

---

5. *Burns* does not set up a requirement as to the *number,* but rather the *quality* of questions that must be asked. Excusing the jurors in *Burns* was deemed premature only because the relevant and critical questions had yet to be asked.

6. The record reveals no impediment to defense counsel proffering more questions or asking that the court or prosecutor pursue further questioning. *Cf. Goodwin v. Balkcom,* 684 F.2d at 814 (court refused defense counsel's request to question further the jurors excused for cause). *See United States v. Butera,* 677 F.2d 1376, 1383–84 (11th Cir.1982) (no error in court conducted voir dire where all questions that counsel proffered were asked).

7. There is no evidence in the record that any of the venirepersons hesitated before standing up or stepping forward.

8. Critical to the analysis in pretrial publicity cases is an assessment of whether, from the publicity, a juror has developed an opinion about the case and whether the juror can lay aside any impression or opinion developed. *Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1642–43; *United States v. Davis,* 583 F.2d at 197; *Calley v. Callaway,* 519 F.2d 184, 205–06 (5th Cir.1975) (en banc), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). Thus, the inquiry is closely analogous to that required in the *Witherspoon* context.

tion did not ascertain the critical information needed to determine whether pretrial publicity had affected the right to an impartial jury, the court ruled that the trial court had an insufficient basis for exercising its duty to decide whether that right had been impaired. *Id.* at 197–98. "Without establishing an inflexible rule" for accomplishing the task, *id.* at 198, the court held that the trial court must assess whether the critical questions in pretrial publicity cases have been answered. *Id.* at 197–98.

In *United States v. Gerald,* 624 F.2d at 1297–98, where virtually the same question was asked as in *Davis,* counsel for defendant failed to direct the court's attention to specific items of publicity and did not request individual voir dire. Distinguishing *Davis,* the court upheld the convictions. *Id.* at 1296–98.

These two cases are helpful to our inquiry. First, individual questioning is not required if other effective means of eliciting necessary responses are used.[9] *United States v. Davis,* 583 F.2d at 196–97, 198. Second, specific objections and requests for individual voir dire are crucial. *Compare United States v. Davis,* 583 F.2d at 196 *with United States v. Gerald,* 624 F.2d at 1297–98. The absence of specific objection or request for individual or further group questioning is a valuable indicia that the procedures utilized were satisfactory to defense counsel and that none of the circumstances of the voir dire prompted counsel to consider a particular, alternative procedure more appropriate. *See United States v. Butera,* 677 F.2d 1376, 1383–84 (11th Cir. 1982). In the instant case defense counsel, while not barred from doing so, did not bring to the court's attention that any of the venirepersons who stood up and stepped forward appeared hesitant or confused; nor does the record otherwise indicate any hesitation or confusion. No request for individual voir dire was made. Accordingly, I find

**9.** In *United States v. Blanton,* 700 F.2d 298, 305 (6th Cir.1983), a prejudicial publicity case on which the majority relies in concluding that without individual questioning the strength of a venireperson's opposition to capital punishment is impossible to ascertain, the Sixth Circuit did not condemn group voir dire. To the contrary, the *Blanton* court relies in large part on *United States v. Davis, supra,* in concluding that individual voir dire is not necessarily required. *United States v. Blanton,* 700 F.2d at 306. In *Blanton* the court reversed the conviction because the *questions* were not extensive

no error in use of the group voir dire in lieu of individual examination of each juror. *See United States v. Gerald,* 624 F.2d at 1297–98; *United States v. Shavers,* 615 F.2d 266, 268 (5th Cir.1980); *United States v. Delval,* 600 F.2d at 1102.

The majority states that the venireprisons "[were] not able to request further explanation or indicate that [they] [did] not understand the question." Majority Opinion, at 1559. There is no indication in the record that the prospective jurors were precluded from articulating any lack of understanding of the questions or asking for clarification.

Concluding that there is no inherent constitutional defect in either the collective voir dire or the elicitation of nonverbal responses, in light of the clear, precise articulation of the crucial *Witherspoon* questions, I would affirm the challenges for cause of the venirepersons excused pursuant thereto.

This leaves the dismissal of Ms. Woodlief. While she did not respond to the collective voir dire by standing up, upon reconsideration and after having had the benefit of hearing in context all of the precise questions directed to the entire panel, she indicated that she did not believe in capital punishment. The following dialogue ensued:

> THE COURT: You didn't understand the question that was posed to you awhile ago?
>
> THE JUROR: Yes, I did at that time. I thought that under certain situations and possibly to rationalize this to myself, but sitting here and observing, *I don't think I could do it, I really don't.*
>
> [She was then excused for cause. Defense counsel invoked the "same objections as to the others."]

Trial Transcript at 400–01 (emphasis supplied).

enough to allow the trial court to determine whether prejudice existed. "The trial court's questioning was less extensive here than in any of the cases from other circuits which found the questioning adequate. No inquiry was made of the veniremen about the extent of their exposure to the case ... More important, the trial court did not ask the veniremen whether any had formed an opinion about the case." *Id.* at 307. Thus, *Blanton* stands for no more than the proposition, with which I have no dispute, that failure to ask the critical questions will make a group voir dire inadequate.

The majority focused solely on the use of the word "think" to conclude that Ms. Woodlief's answer was ambiguous. However, we cannot evaluate the words when taken out of context. The complete statement "I don't think I could do it, *I really don't*" (emphasis supplied) convinces me of the unambiguous nature of her response. Moreover, this potential juror had the time to reflect on her earlier response and specifically indicated that she had changed her conclusion. Although an appellate court is deprived of the benefit of hearing her tone of voice and observing her demeanor, *see* discussion *supra* at 1561, the response given, when judged in light of the opportunity to reflect and the emphasis supplied by the repetitive statement, "I don't think I could do it, I really don't", is unambiguous. Once again, the defense counsel raised no specific objection and offered no questions which could be used to rehabilitate the potential witness. Defense counsel simply and routinely asserted the "same objections as to the others."

Viewing the totality of the voir dire of Ms. Woodlief, I would affirm this challenge for cause.

Accordingly, I would affirm on all grounds the denial of habeas corpus relief.

ON PETITION FOR REHEARING AND
PETITION FOR REHEARING
EN BANC

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

BY THE COURT:

A member of this Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

IT IS ORDERED that the cause shall be reheard by this Court en banc *with* oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.